Filed 11/26/25  In re K.C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | B342822 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 22CCJP00042 |
| Plaintiff and Respondent, | |
| v. | |
| A.P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ashley Price, Judge.  Affirmed.

Maryann M. Goode, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Bryan Mercke, Deputy County Counsel, for Plaintiff and Respondent.

Father A.P. appeals from the juvenile court's order declining to place father's son K.C. with his paternal aunt at the December 11, 2024 relative placement hearing under section 361.3 of the Welfare and Institutions Code.[1] We find no prejudicial error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 4, 2022, DCFS filed a section 300 petition on behalf of K.C., who was then two years old, based on the history of domestic violence between mother and her boyfriend R.B.—the father of K.C.'s yet to be born half siblings S.B. and R.A.B.[2] The petition listed K.C.'s father as unknown. DCFS had removed K.C. from mother's care on December 30, 2021 and placed him with resource parent Ms. E.B. The detention report stated mother said K.C.'s father's name was Anthony C., and he was 27 years old. She said father hadn't had any contact with K.C. since his birth, and he currently was incarcerated. DCFS reported there were "no relatives to consider for placement . . . ."

Mother filed a parentage questionnaire on January 7, 2022, through counsel. She alleged Anthony P.—not Anthony C.—as K.C.'s father. She gave his birthdate as "12/25/2022." Mother indicated father was not present at K.C.'s birth nor named on the

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] The court declared S.B. (born February 2022) and R.A.B. (born November 2022) dependents on March 21 and December 16, 2022, respectively. S.B. and R.A.B. are not the subject of this appeal. Mother and R.B. are not parties to this appeal.

2

birth certificate. At the January 7 detention hearing, the court found Anthony P. was K.C.'s alleged father. The court detained K.C. and ordered DCFS "to present evidence of due diligence in attempting to locate father."

"Anthony P[.'s]" whereabouts were unknown. DCFS initiated a due diligence search for him on January 12, 2022. DCFS searched "Anthony P[.]; DOB: 12/25," because mother didn't know father's birth year. The search was unsuccessful. The search sources—including the Department of Corrections and Rehabilitation, the Federal Bureau of Prisons, and the County Jail—found no records, indicating "[n]eed [c]omplete DOB to specifically identify."

At the January 31, 2022 adjudication hearing, the court (Commissioner Peter R. Navarro) found "due diligent efforts ha[d] been made to locate" father, those efforts "were unsuccessful," and the due diligence as to father was complete. The court sustained the petition and set the disposition hearing for March 2, 2022. (The court also had DCFS search "Anthony [C.].") At the disposition hearing, the court declared K.C. to be a dependent of the juvenile court, removed him from parents' custody, and ordered him suitably placed. The court ordered DCFS to provide mother with family reunification services. The court bypassed reunification services for father under section 361.5, subdivisions (a) and (b)(1), as he was an alleged father and his whereabouts were unknown. At mother's counsel's request, the court ordered DCFS to assess the caretaker of K.C.'s newborn half sibling S.B. for K.C.'s placement.[3] On August 30, 2022, the court continued mother's reunification services.

---

[3] The caretaker couldn't accept more children.

On January 31, 2023, K.C. was placed with a new caregiver, Ms. A.B. Ms. E.B. had asked for K.C. to be re-placed "due to the tumultuous relationship" she had with mother. K.C.'s half sibling S.B. also was placed with Ms. A.B. R.A.B. was placed with resource parent Ms. S. On February 28, 2023, the court continued mother's reunification services.

DCFS reported that, on July 19, 2023, paternal grandmother had called the social worker. Paternal grandmother told the social worker father was incarcerated, and she wanted to establish paternity on his behalf. The social worker stated she had been receiving calls from father, but they had dropped when she tried to accept them. On August 24, DCFS informed the court through a last minute information (LMI) that father had reached the social worker on August 15. He told the social worker his place of incarceration and that he wanted his mother—paternal grandmother—to care, and provide permanence, for K.C. Father stated he understood mother wanted the siblings to stay together, but his family would take only K.C. Father asked to complete a DNA test before DCFS "proceed[ed] in having [K.C.] under his mother's care." Father also told the social worker his sisters, paternal aunts A.P. and P.T., could assist in K.C.'s care.

At the August 28, 2023 hearing, minors' counsel reiterated the LMI's report, and father's request that K.C. be placed with paternal grandmother if he established paternity. Minors' counsel asked the court to order the DNA test. DCFS's counsel noted a paternal aunt might also be available for placement. Mother said she wanted her children to stay together. The court ordered the DNA test and set a September 27 return hearing date.

Meanwhile, an associate social worker had interviewed paternal grandmother and paternal aunt P.T. on August 23, 2023, as part of DCFS's concurrent planning assessment. Paternal grandmother " 'want[ed] adoption' " and was open to adopting K.C.'s two half siblings, as well. Paternal grandmother had not yet met K.C. P.T. said, " 'If it came down to it, I'm willing to offer adoption or legal guardianship but just for the one child (K[.C.]). He is family and we have a responsibility to him. If we are able to help, we will help.' " P.T. never had met K.C., but she knew of him. The social worker also called paternal aunt A.P. but she was getting on a plane. On August 25 and 29, the social worker called and left a voicemail for A.P., and also texted her, but as of September 20 A.P. had not contacted the social worker. Earlier, the social worker had spoken to K.C.'s and S.B.'s caregiver, Ms. A.B. She wanted to adopt the two boys and was open to providing permanency for their sibling R.A.B. Ms. A.B. said she was open to the boys having continued visits with R.A.B. if she were unable to adopt him. DCFS recommended the concurrent plan of adoption for K.C. and S.B. by Ms. A.B.[4]

On September 14, 2023, the court terminated mother's reunification services and set the matter for a section 366.26 hearing. The minute order noted father was not offered reunification services. In its LMI for the September 27 hearing, DCFS informed the court it had not received the DNA test

---

[4]     These interviews were documented in a concurrent planning assessment report, completed on September 20, 2023. DCFS filed the report on January 5, 2024, with its section 366.26 report.

results.  The court confirmed the DNA samples had been received, but the results were not in.  The court continued the matter to October 11 for a report on the results.

On October 10, 2023, DCFS still had not received father's DNA results.  Counsel appeared as a friend of the court for father.  The court continued the matter to November 15 to confirm appointment of father's counsel.  The court also ordered DCFS to interview paternal grandmother and paternal aunts A.P. and P.T. about K.C.'s placement.  The matter was ordered transferred—effective November 13, 2023—to a department in a different courthouse.

The social worker spoke with paternal grandmother on November 8, 2023 about possible placement for K.C. and his two half siblings.  Paternal grandmother said she was interested in taking all three children—she did not want to separate the siblings.  The next day, the social worker spoke with A.P.  She also was interested in caring for K.C. and his half siblings.  The social worker could not reach P.T.

Counsel made a special appearance for father at the November 15, 2023 hearing.[5]  Counsel anticipated her colleague would file an *Ansley* motion for father.[6]

---

[5] The original judicial officer (Commissioner Navarro) presided over this hearing.  The next hearing was before the judge in the department to which the matter had been transferred (Judge Ashley Price).

[6] *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, 481 (*Ansley*).  An *Ansley* motion seeks to set aside jurisdictional and dispositional orders based on a lack of due process notice of the dependency petition.  (*Id.* at pp. 481, 483.)

6

In its LMI for the December 14, 2023 hearing, DCFS reported it was awaiting background results on paternal relatives. DCFS recommended the court return the three children to home of mother based on her progress. Father's counsel, making a special appearance, was continuing "to assess" *Ansley* and *Kelsey S.* issues.[7] The court continued the matter.

On January 4, 2024, father filed a parentage statement asking the court to find he was K.C.'s presumed parent. He stated he had lived with K.C. and mother at his sister's home from K.C.'s birth until February 2020, and he had told his family and friends that K.C. was his child.

DCFS's January 11, 2024 LMI recommended the court order family maintenance services for the three children with mother. On January 12, the court ordered the three children released to mother's custody and took the section 366.26 hearing off calendar. Father's counsel was appointed and generally appeared. Counsel informed the court father wanted to litigate the issue of paternity. The court was unsuccessful in having father appear by Webex from prison. The court therefore set a paternity hearing for February 9. The court noted for the record that father's relatives—paternal grandmother and paternal aunt P.T.—were present in the courtroom. They had informed the court they were interested in placement of K.C. should that become necessary. Father's counsel asked that DCFS attempt to contact father about his relationship with K.C., as he was

---

[7] *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 821 (constitutional right of unwed father to withhold consent of child's adoption).

seeking presumed father status.  The court, which had inherited the case from another department, discovered the DNA results identified father as K.C.'s biological father.  The court elevated father from alleged to biological father.  The court ordered DCFS to interview father, and mother, about the length of time he had spent with K.C., any financial resources he had provided the child, and his involvement with the child since his birth.

The court also ordered DCFS to contact father's prison to arrange for his virtual attendance at the February 9 hearing. The court ordered DCFS to speak to the liaison at both father's and father R.B.'s correctional facilities about the ability for children to visit in person and whether a regular virtual visitation schedule could be arranged.  For the time being, the two fathers were to have virtual visitation only.  DCFS filed an LMI on February 6, 2024 that referred to its inquiry about visitation at R.B.'s facility.  The LMI did not mention father at all.

On February 7, 2024, DCFS received a report that S.B. (then two years old) had bitten R.A.B. (then one year old) more than a dozen times.  Social workers went to mother's home. Mother said S.B. "need[ed] 'anger management' " and had bitten his brother on his face, nose, and arm.  R.A.B.'s former caretaker Ms. S. had picked him up and sent mother photographs of bite marks she discovered on his back.  Mother was "shocked"— she hadn't checked his back.  The social workers went to Ms. S.'s home.  R.A.B. had been in her care since February 6.  Ms. S. stated that she had been caring for the child "most of the time" since his release to mother.  Ms. A.B. also had been helping mother with K.C. and S.B.

At the February 9, 2024 hearing, the court again ordered DCFS to interview mother and father and to inquire about virtual visitation for father. The court ordered DCFS to facilitate father's virtual visits with paternal relatives acting as monitors.

On February 21, 2024, DCFS filed a section 342 petition on behalf of all three children based on mother's failure to supervise R.A.B. properly, and her medical neglect of the child, as well as mother's failure to make an appropriate plan for the children. The detention report filed February 21 stated there were no relatives to consider for placement.

At the March 4, 2024 hearing, the court explained it was continuing the paternity hearing to April 10. Father's counsel needed information from the social worker who was to interview father, or father had to be present to testify to that information, but father had not logged into the hearing. The court ordered DCFS to communicate with father's facility to set up his virtual appearance on April 10, to interview father about his relationship with K.C., and to interview mother about whether father ever denied paternity. Father's counsel also asked that DCFS address visitation and paternal relatives as monitors. Counsel explained, "All of these issues need to be explored [and] have been on the table for a number of weeks. I would ask that they be addressed forthwith." On March 8, the court denied DCFS's request that the court remove the children from mother's care.

Father appeared for the April 10, 2024 paternity hearing by phone. Father's counsel was not available. Accordingly, the court trailed the paternity hearing to the April 22 adjudication hearing on the subsequent petition. The court ordered DCFS to follow the court's earlier order to interview father about the paternity issues. As the court had received evidence that R.A.B.

again had been bitten on his face (sometime before March 13), the court detained R.A.B. from mother. The court ordered DCFS to make unannounced visits at mother's home to check on K.C. and S.B.

The contested paternity hearing went forward on April 22, 2024. Father appeared by phone. Father testified he had resumed his on- and off-again relationship with mother after K.C.'s birth. He first met K.C. when the child was about a month old. He told his family K.C. was his child. Father testified K.C. was in his care about five days a week from about January until March 23, 2020, when he was arrested. Father testified he bought K.C. clothes, diapers, and formula, changed his diapers, fed him, and woke up with him at night. Over mother's objection, the court found father was the presumed father of K.C. At counsel's request, the court ordered DCFS "to make best efforts" to facilitate visitation between K.C. and paternal grandmother and aunt.

A few days later, on April 25, minors' counsel asked the court to detain K.C. and S.B. from mother. Ms. A.B. had reported mother continued to make inappropriate plans for the children while in Ms. A.B.'s care, including leaving them with her overnight. Mother appeared to be engaged in sex work. Counsel did not believe K.C. and S.B. were safe with mother. Mother's counsel objected. Father's counsel asked that, if the court detained K.C., paternal grandmother be assessed as a relative placement.

The court ordered the two children detained. Mother's counsel did not want the children to be placed with their former caregiver Ms. A.B. Minors' counsel argued the children had been with Ms. A.B. for years and were bonded with her. Father's

counsel asserted paternal relatives "didn't really have an opportunity or chance to assert this issue [placement] until very, very late in the game . . . . There is still a relative preference while we are getting this procedural posture of the case and [I] would just ask the court to make even a more specific order that my client's mother's home be assessed and we have information about whether or not she can take placement at an upcoming hearing." Father's counsel noted DCFS had had paternal relatives' information and communications with them since the previous year.

The court set a section 361.3 relative preference placement hearing for May 17, 2024. The court ordered DCFS to prepare a report addressing placement with paternal grandmother and paternal aunt, as well as the children's bond and relationship with Ms. A.B. Minors' counsel asked the court to place the children with Ms. A.B. pending the hearing and to make a finding that K.C. and S.B. were a sibling set. The court understood that, because the children were detained at the same time, they were a sibling set by operation of law. The court found it would be appropriate for the children to remain with Ms. A.B. until the next court date. The court explained, "The children have been bounced back and forth. The court wants to try and minimize the amount of trauma that the children are going through, and it might be that [father's counsel] has strong arguments for relative placement. However, at this time, the court doesn't feel it is appropriate for us to place the children with somebody completely new understanding that we have a pending placement hearing coming."

The next day, minors' counsel asked the court to re-order DCFS to place the children with Ms. A.B. DCFS had placed the

11

children in a foster placement because an investigation was pending as to Ms. A.B.[8]  DCFS and mother objected to the children's return to Ms. A.B.  The court—noting "having to change placements is very traumatic for the children"—found it was in the children's best interest to be with Ms. A.B. pending the section 361.3 hearing, as she had an existing relationship with and had been caring for them "for quite a period of time."

In an LMI filed May 1, 2024, DCFS stated mother had denied being involved in sex work.  Mother did not want K.C. and S.B. to be placed with father's family members because they hadn't played an active role in K.C.'s life.  Mother said paternal grandmother had never met K.C.  She said father had abandoned her and K.C. and was incarcerated not long afterward.  Mother did not want the children to be separated.  According to the prison, father would not speak to the social worker and had directed the social worker to contact his lawyer with any questions.

On May 2, 2024, the court heard argument about the earlier detention request.  The court explained its decision was "very difficult" and the court was left with making "somewhat of a credibility decision as to whether the children were really at risk."  The court affirmed its order removing K.C. and S.B. from mother's custody.  Father's counsel wanted the social worker to report on all of DCFS's efforts to locate father and to contact paternal relatives to arrange visitation.  DCFS's counsel

---

[8]     Ms. A.B. had been over capacity in January, and there was a complaint of physical abuse involving other children in her care —putting Ms. A.B.'s home's approval on hold.

objected.  The court noted it had ordered virtual visitation for father on January 12, 2024, when the court had elevated his status to biological father; had ordered—on February 9—DCFS to facilitate virtual visits with paternal relatives as monitors; and also had ordered DCFS to call father's facility about the process for setting up virtual visits.  The court ordered DCFS to follow up with the earlier orders, to update the court on what the social worker had learned about visitation options at the facility, and to report on its efforts to facilitate father's visits.

DCFS filed another LMI on May 9, 2024.  On May 8, K.C. and S.B. had been removed from Ms. A.B.'s care at her request.  She no longer wanted to be involved in the case due to mother's behavior toward her.  She asked that the children be removed immediately.  The children had been placed in an approved resource family home with Ms. G.

Father had called the social worker the day before and asked that K.C. and his two half siblings be placed with paternal family members.  Earlier, on May 2, 2024, the dependency investigator (DI) spoke with paternal aunt A.P. about placing K.C. and S.B. in her care.  A.P. wanted the children placed with her, but she first had to discuss it with paternal aunt P.T. and paternal grandmother, with whom she lived.  On May 6, P.T. sent the DI a text stating, " 'We are all on board for placing the children with our family.' "  However, P.T. did not respond to the DI's reply asking about the family's availability.  The DI tried to call P.T. but got her voicemail.  Neither aunt responded to calls on May 7 and May 8.

The social worker reported he'd explored placing K.C., S.B., and R.A.B. with father's relatives.  The relatives told him that, after speaking to R.A.B.'s caregiver Ms. S., they no longer wished

13

to have R.A.B. in their care. Paternal relatives wanted to start visits with K.C. and S.B. before committing to their placement. They also told the social worker they had not returned the DI's calls or responded to her texts because they didn't know who she was. Paternal relatives had a visit scheduled with the children on the weekend of May 11.

Father appeared at the May 17, 2024 section 361.3 hearing by Webex. The court continued the hearing to June 20 to give DCFS more time to investigate the various relatives' homes. Father's counsel said there had been "a disconnect in communication" with paternal family members regarding placement. Counsel had spoken to P.T. earlier that day, and she was interested in having all three children. Father asked that the social worker reassess P.T. for placement. Minors' counsel asked that the court order DCFS to assess placement of all three children with R.A.B.'s current caregiver Ms. S. Mother objected. The court ordered DCFS to assess for placement: R.B.'s mother, paternal aunt P.T., and Ms. S. DCFS's report was to state whether each would be willing to take all three children. The court also ordered DCFS to facilitate virtual visits between father and K.C. and to report on those efforts.

According to an LMI filed June 14, 2024, paternal aunts P.T. and A.P. had had two visits with K.C. and S.B. They had been unable to visit R.A.B. yet. Paternal relatives stated they needed time to develop a relationship with the children before committing to their care. Ms. S. wanted S.B. to begin therapy and overnight visits before she committed to taking all three children. Caregiver Ms. G. said S.B. no longer was biting but was aggressive toward K.C. Both children had difficulty regulating their emotions, were easily agitated, and often threw tantrums.

14

K.C. woke up every night frightened. Ms. G. acknowledged the children "need[ed] a lot of love, support, and structure." She said father called K.C. every day.

DCFS also filed pre-release investigation reports assessing the three placement options. The DI assessed paternal aunt P.T.'s home on May 28, 2024. DCFS reported on each of the section 361.3 enumerated factors. The report stated it was not in K.C.'s and S.B.'s best interests to be placed with P.T. As for the wishes of the parents and relatives, on June 12, mother told the DI she agreed with placing the children with P.T. and would like R.A.B. to be placed there too. Father wanted K.C. to be released to his family members.

P.T.'s home was clean, well-organized, and safe. P.T. was willing to provide the children with permanency by way of adoption or legal guardianship. P.T. had not had a relationship with father or mother until recently, so she did not know the children. P.T. wanted to start with overnight visits so the children could "cultivate a relationship with her," without disruption to their current placement and routines. P.T. wanted "to care for the children and provide them with a loving and stable home environment in which they can thrive and continue to grow once the children have develop[ed] a relationship with her." P.T. did not feel comfortable monitoring visits for mother and R.B. P.T., who is a wellness coach, stated she must maintain a peaceful lifestyle. She acknowledged caring for children can be stressful. She was "not willing to compromise her tranquility, as she is aware that parents can be difficult to engage." P.T. agreed to facilitate visitation between the children and other relatives and to monitor those visits if asked. P.T.'s family members would help her care for the children while she worked,

15

but she planned to enroll them in daycare for "additional stimulation."

DCFS stated that, at the time, P.T. was not an appropriate placement because she had asked for "additional time to develop a relationship with the children prior to the children being placed in her care." DCFS reiterated P.T.'s statement about not being willing to compromise her tranquility. DCFS stated it "does not want to set up [P.T.] or the children for failure and therefore placement would not be appropriate." DCFS "implore[d] the Court not to release the children as this would lead to failure for all involved based on the assessment and information gathered. [P.T.] is not ready to fully commit to care for the children and work with the parents." DCFS also found it was not in the children's best interest for K.C. and S.B. to be released to S.B.'s paternal grandmother A.M.'s care at that time due to safety issues.

Father was not present at the June 20, 2024 hearing—the prison did not make him available. Mother's counsel stated mother preferred the children be placed with P.T. She asked that DCFS ensure P.T. had visits with the children so they could move safely to her home. Minors' counsel wanted R.A.B. to remain with Ms. S., with whom he had lived since birth. Mother's counsel noted, "It is always [DCFS's] priority to place with a family member." Counsel believed Ms. S. was thwarting visits between R.A.B. and P.T. Father's counsel argued the sibling set designation was "not absolute with respect to whether all children need to be placed in the exact same home." Counsel argued for keeping "an open mind to the idea that perhaps placement in the same home may not happen, but to the extent we are trying to make that happen, I think the law requires that

16

relatives be preferred." The court ordered DCFS to initiate visits between P.T. and R.A.B. "forthwith." The court continued the hearing to July 16.

According to an LMI filed July 12, 2024, the DI spoke with Dr. Ryan—the children's mental health services provider—on June 14. Dr. Ryan would not make a placement recommendation. She was under the impression the children were not placed together, however, due to S.B. having bitten R.A.B. Dr. Ryan stated, " 'I thought it was just common sense not to place together.' " Paternal relatives were to start overnight visits with K.C. and S.B. on July 12. They didn't feel comfortable having all three children in their care. P.T. told the social worker "she would only be interest[ed] in having her biological nephew released to her." She did "not want to overwhelm herself caring for three small children." Both Ms. G. and Ms. S. asked to have no contact with mother.

For the July 16, 2024 hearing, father appeared telephonically. Addressing the question of reunification services on the supplemental petition, the court explained, "The best interest for these children is to stop bouncing around to different places, to different babysitters, to different caregivers. If the children are doing worse now, it is because they have been repeatedly moved. They don't have consistent routines. They don't have consistent service providers." The court declined to order an additional, discretionary period of reunification services for mother and found all parents were "out of time for reunification." The court found it was in the children's best interests "to move towards permanency" by setting a section 366.26 hearing. Due to the complexity of the placement decision, the court continued the section 361.3 hearing to September 16.

Father's counsel stated the LMI did not accurately reflect what he understood to be P.T.'s availability to care for the children.  He asked that DCFS's report include a direct interview of her.  Counsel noted father's objection to the setting of the section 366.26 hearing.  The court ordered DCFS to interview P.T. after the children had overnight visits with her.

In September, DCFS reported K.C. and S.B. had had overnight weekend visits with P.T. during the weekends of July 12 and August 16.  On August 27, the social worker interviewed P.T.  She enjoyed the time with K.C. and S.B.  She "felt that there is a good connection with" K.C.  P.T. felt remorseful about the time that had passed and wanted to be a source of support for the children.  P.T. wanted "the opportunity to adopt" K.C.  She said she'd maintain K.C.'s connection with his siblings S.B. and R.A.B.  She explained that she at first "was told that the only way she would be able to adopt her nephew was to adopt [S.B.] as well."  P.T. "did not want to lose the opportunity to care for her nephew so she felt obligated to say she would also take on [S.B.]."  Now that she had had "time to process the information," "she would love the opportunity to provide [K.C.] with permanency."  P.T. stated she would build a relationship with whomever adopted S.B. and R.A.B.  The next day, P.T. told the team "her goal was to adopt her nephew [K.C.] and if the only way to have him was to adopt [S.B.] as well, she would be willing to."

P.T., Ms. S., and Ms. G. had agreed to rotate weekends for overnight visits.  P.T. was to take the children the weekend of September 6.  On September 5, she told DCFS she couldn't pick the children up that weekend.  She had not yet called to reschedule.  DCFS stated P.T. "at this time" did not appear

"to be a good fit as the permanency plan would be to have all three minors adopted together."

DCFS reported father had remained in contact with DCFS. He believed he would be released from prison in February 2025.

Father was not present for the September 16, 2024 hearing. The court acknowledged the difficulty of the placement decision given K.C. and S.B. had lived a significant part of their lives together, but had different fathers, and R.A.B. had lived with his caregiver since he was a newborn. The court believed "it would be aided by additional information from Dr. Ryan." The court ordered DCFS "to interview Dr[.] Ryan about her professional opinion as to the children's existing sibling bond, minimization of trauma regarding replacement, and any safety concerns of placing the children together."[9] The court continued the hearing to November 5.

DCFS determined the best option for the three children would be adoption by Ms. G., as she had been open to adopting the three children since DCFS started asking about permanency. Ms. G. had maintained communication with the children's fathers. According to Ms. G., father called K.C. almost every day and had video calls with him.

Father appeared at the November 5 hearing by Webex. The court ordered DCFS to prepare a section 361.3 report explaining its reasoning for its placement recommendation with Ms. G. The court continued the matter. DCFS filed its report on November 26. P.T. had not participated in the most recent weekend visitation schedule. A social worker spoke with P.T.

---

[9] It does not appear Dr. Ryan ever gave such an opinion.

19

on October 3, 2024. She did not want to restart the rotation because she did not want all three children to come over. She said she'd like to have the next visit with only K.C. P.T. was willing to take in her nephew, but she believed S.B. and R.A.B. belonged together. The social worker explained DCFS's goal was to keep siblings together. P.T. understood; she was interested only in K.C. DCFS had not had contact with her since October 17.

DCFS did not believe separating K.C. and placing him with P.T. would be in his best interest. K.C. had been in Ms. G.'s care since May 2024 along with his brother, where they both were receiving "appropriate care, love, and support." DCFS reported R.A.B.'s weekend visits with K.C. and S.B. at Ms. G.'s home were appropriate and without incident. DCFS "strongly believe[d] that separating the children from each other would be a disservice to the children as they ha[d] created a special bond with each other."

The children were aware they were brothers—the social worker said K.C. was "nurturing" toward his brothers when they cried. Another social worker had seen K.C. take R.A.B.'s hand and say, " 'Don't cry [R.A.B.], I'm right here.' " K.C. would ask about R.A.B. if he and S.B. arrived at the DCFS office first for their visit. S.B. shared snacks and played with his siblings. R.A.B.—who cried when the social worker picked him up from Ms. S.—now "appear[ed] to be comfortable" leaving with the social worker. He seemed to know where he was going and would get excited when he saw his siblings. DCFS recommended R.A.B. be placed with Ms. G. DCFS also noted father continued to have telephone and video calls with his son.

"After careful consideration," DCFS believed it was "in the best interest of the children to stay together as the children have already created a sibling bond with each other. The children deserve[d] to have the opportunity to grow up together, as siblings, in an environment where they will be given the opportunity to thrive. The children [had] demonstrate[d] love and care for each other, and continuing to separate them [was] doing a disservice to [them]." Ms. G. was willing to take in R.A.B. and adopt the three children "so that they can grow together." The three children visited together with Ms. G. the most. She was open to facilitating visits and calls with the parents.

The section 361.3 hearing finally took place on December 11, 2024. Father appeared virtually. P.T. appeared by Webex. She testified she was K.C.'s "auntie" and her visits with him had started around July 2023. She couldn't recall when overnight visits began but testified she had had four overnight visits with K.C. Her last overnight visit had been in August. P.T. said the visits had stopped because mother was making threatening phone calls. P.T. testified she "would love to continue overnight visits with [K.C.] and [K.C.] only, . . . and see how that builds." She was "a hundred percent willing" to provide him with permanency through adoption or legal guardianship.

On cross-examination, P.T. testified she had known K.C. was her nephew since father had received the DNA results. Paternal relatives first met him at his four-year-old birthday party. S.B. had spent the night at P.T.'s home. She had not met R.A.B. The court clarified that P.T. had had about four to five daytime visits with K.C. and about four overnight visits with him.

21

Ms. S. also testified.  She still was willing to take all three children but wanted them all to have therapy first.  She had visited with all three children more than 30 times during the case and had had two overnight visits with them.

Mother's counsel argued the children should be placed with Ms. G.  Father's counsel argued K.C. should be placed with P.T., relying on *In re N.J.* (2024) 104 Cal.App.5th 96 (*N.J.*).  Counsel noted Dr. Ryan "had even stated when interviewed on June 14[, 2024], that the separate placements made sense."  Counsel argued it appeared "separate placement is in line with the child's best interest.  Relative placement would allow the child to continue his relationship with his family.  That is certainly something that is in the child's best interest."  Minors' counsel asked the court to place all three children together with Ms. S.  Alternatively, counsel asked the court to place S.B. and R.A.B. with Ms. S. and K.C. with P.T.  Counsel argued the sibling benefit at this time outweighed the relative placement preference.  DCFS's counsel argued that, "[a]s [a] whole, it seems as if Ms. [G.] is [the] most consistent and most reliable person we can look towards with regard to permanency for all three of the children together."  Counsel thus asked the court to place R.A.B. with Ms. G.

Before issuing its ruling, the court agreed that "none of these choices is perfect.  None of these placements are perfect."  The court noted it had "continued this case several times because I just felt like I needed more information to be able to make this lasting choice because . . . today's decision could drastically change the course of [the children's] lives moving forward."  The court also noted that the relative placement preference "simply means that [DCFS] and the court must consider the relative first

22

before considering other placement options pursuant to 361.3 subsection (b)[,] subsection (1), and preferential consideration does not mean a presumption that placement with a relative is appropriate or in the child's best interest." The court went through the section 361.3 factors.

The court stated paternal aunt P.T. was willing to take only K.C., but K.C. was "very bonded" with S.B. because they "essentially" had been raised together. The court found particularly telling P.T.'s testimony that "she wanted to have overnights with [K.C.] and [K.C.] only, to quote, 'see how that feels [builds].' [¶] We are way past exploring how things feel with [P.T.]. The court is deciding today for a long term and lasting placement. [¶] When we ordered the [pre-release investigation] originally on [P.T.] back in June, she wasn't ready then either and wanted to spend more time getting to know the children. [¶] And so[,] based on her testimony today, the court is not confident that she's ready today and that she would be able to handle the very complicated and sometimes very heated situations that occur between parents and caregivers in this case. I do not believe it is in the best interest of [K.C.] to be separated from his brothers. I do find that placing the children in the same home is a more important consideration here and . . . the nature and duration of the relationship between [K.C.] and [P.T.] is relatively brief. [¶] So on balance of the 361.3 factors, the court is declining to place [K.C.] with [P.T.]."

The court then considered whether the boys should be placed with Ms. G. or Ms. S. The court's "main focus" was "where are the children going to thrive and succeed long term without threats of 14-day [removal] notices." The court explained:

23

"One of the things that the court has learned during the pendency of this case is that these boys have a lot of energy and we have heard through various reports about their behaviors and their needs, not blaming the children because they've been through an extraordinary amount of things that would cause acting-out behaviors, hyper behaviors, unsettled behaviors.

"And what I think is telling and compelling is that Ms. G[.] has had [K.C.] and [S.B.] since [May] with no reported concerns and they all do well, and when asked if there [were] any issues when [R.A.B.] joined them— because the court is concerned about the fact that in the past [R.A.B.] has been bitten and attacked—and Ms. G[.] reports that during the overnights at her house . . . the boys do well together and there are no concerns.

"The court believes that is a reflection of a strong, experienced caregiver; that these boys are finally settling down and that Ms. G[.] is the caregiver that's been able to support [K.C.] and [S.B.] and has welcomed [R.A.B.] into the overnights as well.

"I also think it's important that [DCFS] highlighted the bond between the siblings. Between [K.C.] and [S.B.] is obvious—they have been together essentially their whole lives —but [R.A.B.] is now bonded to the older boys

as well.  Even though he's not verbal, he shows excitement when he knows that he is going on a sibling visit.

"And at the end of the day, the court is trying to find the caregiver that is most solid, most stable, without issue."

The court explained the facts here were different from *N.J.*, and that, if the reviewing court were to find "that the relative placement efforts by [DCFS] were inadequate, the court is holding, as the record reflects, a very robust relative placement hearing today.  I have gone through all of the 361.3 factors to explain why the court is not placing the children with relatives."

The court continued:

"The court does believe it is in the best interest of the children to stay together.  The court believes that it is important to consider the parent's wishes.  The court also has considered all of the factors that I have gone through previously—the nature and duration of the relationship of the children and the relatives—and the court finds that the most stable and consistent placement for all three children is with Ms. [G.], and that is the recommendation by [DCFS]."

Father's counsel objected to the denial of K.C.'s placement with paternal aunt.  Father filed a notice of appeal from the court's findings and orders made at the December 11, November 5, September 16, July 16, and June 20, 2024 hearings.

## DISCUSSION

Father essentially contends DCFS and the juvenile court did not timely assess paternal relatives for placement under section 361.3, and the juvenile court abused its discretion by focusing almost exclusively on placing the siblings together. DCFS contends father lacks standing to challenge the relative placement issue, and father failed to show the court abused its discretion in any event.

### 1.  *Standing*

"[O]nly a person aggrieved by a decision may appeal." (*In re K.C.* (2011) 52 Cal.4th 231, 236 (*K.C.*).)  "Until parental rights are terminated, a parent retains a fundamental interest in his or her child's companionship, custody, management, and care."  (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053 (*Esperanza C.*).)  After reunification services are terminated, however, " 'the parents' interest in the care, custody and companionship of the child [is] no longer paramount.  Rather, at this point, "the focus shifts to the needs of the child for permanency and stability." ' "  (*K.C.,* at p. 236.)

The parties dispute whether father—whose parental rights remained intact, but whose reunification services had been bypassed—has standing to appeal the court's order declining to place K.C. with paternal aunt.  (Compare *In re A.K.* (2017) 12 Cal.App.5th 492, 499 [father whose reunification services had been terminated could not "establish that his rights and interest in reunification" were "injuriously affected by any failure to consider the paternal grandmother for placement" and thus had no standing to assert error under section 361.3] with *K.C., supra*, 52 Cal.4th at p. 238 [parent has standing to appeal placement decision if decision affected order terminating

26

parental rights]; *Esperanza C., supra*, 165 Cal.App.4th at pp. 1050–1051, 1053–1054 [mother whose parental rights had been bypassed but not terminated at time of proceedings had standing to appeal relative placement issue].)  For purposes of this opinion, we assume—without deciding—father has standing to appeal.

## 2.    *Section 361.3*

The section 361.3 relative placement preference requires the court to give "preferential consideration" to a relative's request for placement of a dependent child who has been removed from a parent's custody.  (§ 361.3, subd. (a).)  " 'Preferential consideration' " means "that the relative seeking placement shall be the first placement to be considered and investigated." (*Id.*, subd. (c)(1).)  By its terms, section 361.3 "provides for preferential consideration of a relative's request for placement of a child with the relative early in dependency proceedings, before the disposition order."  (*In re J.Y.* (2022) 76 Cal.App.5th 473, 477 (*J.Y.*); § 361.3, subd. (a).)

If the child's placement must change after disposition, relatives again must be given preference up until parental rights are terminated.  (§ 361.3, subd. (d) ["[s]ubsequent to [the disposition hearing], whenever a new placement of the child must be made, consideration for placement shall again be given . . . to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements"]; *J.Y., supra*, 76 Cal.App.5th at p. 478; see also *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1032 [relative placement preference applies when a new placement becomes necessary after reunification period but before termination of parental rights].)  As K.C. required a new

27

placement when he again was removed from mother in April 2024, the statute applied.  (See *N.J., supra*, 104 Cal.App.5th at p. 127 [agreeing with the court in *In re Joseph T.* (2008) 163 Cal.App.4th 787, 794 that " '[n]othing in section 361.3, subdivision (d), states or implies' " that the relative preference post-disposition is limited "to instances where a new placement [is] required"].)

"In assessing a relative's request for placement, DCFS and the court must consider the factors enumerated in section 361.3, subdivision (a)."  (*N.J., supra*, 104 Cal.App.5th at p. 123.)  Those factors include, but are not limited to:  (1) the best interests of the children, (2) the wishes of the parents, (3) proximity of the placement for visitation and reunification with the parents, (4) placement of any siblings and half siblings in the same home, (5) the good moral character of the relative, (6) the nature and duration of the relationship between the child and relative, and the relative's desire to care and to provide legal permanency for the child, (7) the relative's ability to provide appropriate and safe care of the child and facilitate visitation with the child's other relatives, and (8) the safety of the home.  (§ 361.3, subd. (a)(1)–(8).)  "When considering whether to place the child with a relative, the juvenile court must apply the placement factors, and any other relevant factors, and exercise its independent judgment concerning the relative's request for placement."  (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 719.)  "The linchpin of a section 361.3 analysis is whether placement with a relative is in the best interests of the minor."  (*Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862−863 (*Alicia B.*).)

Preferential consideration under section 361.3, however, " 'does not create an evidentiary presumption in favor of a

28

relative, but merely places the relative at the head of the line when the court is determining which placement is in the child's best interests.' " (*Alicia B., supra*, 116 Cal.App.4th at p. 863.) "In other words, when a child is taken from his parents' care and requires placement outside the home, section 361.3 assures an interested relative that his or her application for placement will be considered before a stranger's request." (*Ibid.*)

We review the court's placement decision for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) We will not disturb the court's placement determination " ' "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*Ibid.*) Thus, " ' "[t]he appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Id.* at pp. 318–319.) We will interfere only if, after viewing the evidence favorably to the trial court's decision, we find no judge reasonably could have made the same order. (*Alicia B., supra*, 116 Cal.App.4th at p. 863.)

### 3. *The court did not abuse its discretion*

Father first contends the court abused its discretion "by failing to conduct the relative placement hearing in a reasonable and timely manner." DCFS's due diligence search to locate father at the outset of the case admittedly was problematic. Father's place of incarceration likely could have been identified had DCFS estimated his birth year based on his age. Father, however, does not contend he did not receive due process notice. Accordingly,

29

we do not consider the delay in notifying him of the proceedings in our review of the relative placement assessment.[10]

As father notes, he and paternal relatives had asked DCFS to consider paternal grandmother and/or aunts for K.C.'s placement when father first spoke with the social worker in August 2023. However, as DCFS notes, father wanted to establish paternity through a DNA test before DCFS proceeded with placing K.C. "under [paternal grandmother's] care." That same month, DCFS nevertheless interviewed paternal grandmother and paternal aunt P.T. about providing permanency for K.C. and his half siblings as part of its concurrent planning assessment. Unfortunately, there was a delay in the transmission of the DNA results. Nothing in the record, however, indicates that delay was due to the fault of DCFS or the juvenile court. By the time the DNA results were received establishing father's paternity, the court had ordered the return of K.C. and his siblings to mother's custody, obviating the need for an out-of-home placement. Accordingly, we cannot fault DCFS for not moving forward with assessing paternal relatives for placement of K.C. before the DNA results were received.

But there is no question that, moving forward, some of the delays in the case were attributable to DCFS and may have contributed to paternal relatives being assessed for K.C.'s placement later than they otherwise would have been.

---

[10] In any event, as there is no indication in the record that father ever filed an *Ansley* motion, he has forfeited review of the issue. (See, e.g., *In re Brian K.* (2002) 103 Cal.App.4th 39, 42 [failure to raise due process issue in juvenile court forfeits review of issue on appeal].)

For example, the hearing on father's presumed father request—originally set for February 9, 2024—had to be continued several times until April 22, 2024, because DCFS had not complied with the court's order to interview father (and mother) about his involvement with K.C. after his birth.[11]  Only once father was deemed a presumed father would he have certain rights, such as the entitlement to reunification services, for example.  (*In re D.M.* (2010) 210 Cal.App.4th 541, 544 ["A biological father who is not a presumed father may be granted services but it is not mandatory."].)[12]

Inexplicably, DCFS's February 21, 2024 detention report—filed with the section 342 petition after S.B. bit R.A.B.—stated there were "no relatives to consider for placement."  But that wasn't true.  More than a month earlier, at the January 12 hearing, paternal relatives had stated in court that they wanted to be considered for placement.  At the April 22 hearing, after

---

[11]	The continued March 4 hearing again was continued because father was not present.  As the social worker had not yet interviewed father, counsel could not introduce evidence of his presumed father status without his testimony.  Similarly, the court trailed the continued April 10 hearing date because father's counsel of record was not available.  DCFS still had not interviewed father, and the court had to re-order DCFS—for the fourth time—to do so.

[12]	Although father objected to the court's setting of the section 366.26 hearing in July 2024, there is no indication he ever asked for reunification services after the court made its presumed father finding.  In any event, he likely would not have been entitled to any as he remained incarcerated.

the court elevated father from biological to presumed father, his counsel had to ask the court to order DCFS to facilitate visitation between K.C. and paternal relatives.[13]

On April 25, 2024, when the court detained K.C. and S.B., father's counsel specifically asked that paternal grandmother be assessed for relative placement. Counsel had to ask the court to make a specific order requiring DCFS to assess paternal grandmother's home, noting the relative placement preference applied and DCFS had had paternal relatives' information— and had communicated with them about placement—since the previous year. The court ordered DCFS to do so and set a section 361.3 relative placement hearing, but the court did not immediately place K.C. with paternal relatives. Rather, the court ordered DCFS to place the two children—who were a sibling set —with their former caregiver A.B., pending the upcoming placement hearing set for May 17.

We cannot find the court abused its discretion in failing to do so, however. The court understandably wanted to "minimize the amount of trauma" for the children, acknowledging the children had been "bounced back and forth"—i.e., they had been placed with A.B., returned to mother, and now were being removed from mother yet again. The court found that, pending the hearing on relative placement, it was in the children's best interests to be placed with A.B.—with whom the children were

---

[13] DCFS's section 366.26 report filed much later—in October 2024—didn't even acknowledge father's presumed father status or that he was K.C.'s biological father. It merely noted the court's initial finding that father was the alleged father of K.C.

familiar—rather than with someone completely new.  Under the circumstances, the court's conclusion was not unreasonable.

Moreover, even if DCFS had assessed paternal relatives by then—e.g., if DCFS had interviewed father when first ordered to do so, the court could have made the presumed father finding in February, which in turn could have facilitated visitation between K.C. and paternal relatives sooner—it is not reasonably probable that the court would have placed K.C. with paternal relatives on his detention from mother.  (*In re Celine R.* (2003) 31 Cal.4th 45, 59–60 [error is reversible only if a reasonable probability exists that the court would have reached a decision more favorable to the appellant].)  The court made clear it wanted to ameliorate the trauma the children undoubtedly would suffer from the immediate, and unexpected, removal from mother by placing them with the caregiver they knew, pending the section 361.3 hearing.  Even if—absent DCFS's delays—paternal relatives otherwise would have had some visits with K.C., we cannot conclude it is reasonably likely the court would have opted to place the children with paternal relatives over the caregiver with whom they had had an existing relationship for "quite some time."

In any event, DCFS did not simply ignore or put off paternal relatives as in *N.J.*, where our colleagues in Division Four reversed the court's order denying mother's section 361.3 motion—and order terminating her parental rights.  There, DCFS and the juvenile court "utterly failed to perform [their] duties" to promptly, diligently, and fairly evaluate for placement the aunt who had been asking to take the child since shortly after the child's birth.  (*N.J., supra*, 104 Cal.App.5th at pp. 102–104.)  In May, after the court affirmed its orders removing K.C. and

33

S.B. from mother—and when K.C. and S.B. required a new placement—DCFS contacted paternal relatives. There was some kind of communication "disconnect," however. P.T. had sent a text to the DI stating the family was "on board" to take the children, and father had called the social worker asking that K.C. and his brothers be placed with his relatives. But neither P.T. nor A.P. responded to the DI when she tried to determine their availability. K.C. and his brother thus were placed with Ms. G. P.T. also apparently had told the social worker that the family wanted visits with K.C. and S.B. before committing to take both children and, after speaking with R.A.B.'s caregiver Ms. S., they no longer wished to have him placed with them.

Father contends the juvenile court "pushed" the sibling preference over the relative preference and "continued and continued" the hearing "in order to effectuate a particular outcome pertaining to the sibling factor." In essence, father argues the court focused on the sibling factor to the exclusion of the other section 361.3 factors in abuse of its discretion.

The section 361.3 hearing was continued for seven months. Although unfortunate that it took so long to resolve, we can't say the juvenile court unreasonably delayed the hearing. The record establishes the continuances were for valid, rational reasons, and not to further some pre-judged outcome: to give DCFS more time to assess P.T.'s and the half siblings' paternal grandmother's homes, as well as Ms. S.'s home—DCFS then filed pre-release investigation reports of each placement by the next hearing; to allow father to be present when his facility didn't make him available; to ensure P.T. had sufficient visits with all three children so DCFS could "meaningfully interview[ ]" her "about her ability to take all three children"; to order DCFS to interview

34

P.T. further—at father's counsel's request—after she had overnight visits with the children; to order DCFS to gather information from Dr. Ryan about the children's existing sibling bond and safety concerns to aid the court in its placement decision; and to order DCFS to prepare a section 361.3 report explaining its reasoning for recommending the three children be placed with Ms. G. In any event, from what we can tell, father did not object to the continuances of the section 361.3 hearings.

The court plainly was looking at the placement issue from the standpoint that the children should remain together if possible. The court did not exceed the limits of its discretion under section 361.3 or act unreasonably in putting greater importance on keeping K.C. with his brothers than on his placement with a relative, however. Nothing in section 361.3 requires the court to weigh the enumerated factors equally. "Balancing the benefits of maintaining extended family relationships against the best interests of the child is a critical element in the placement decision. [Citation.] . . . We realize the importance of according relatives a 'fair chance' to obtain custody. [Citation.] At the same time, however, the fundamental duty of the juvenile court is to 'assure the best interest of the child.' " (*Alicia B., supra*, 116 Cal.App.4th at p. 864.) The court thoughtfully engaged in that process.

Contrary to father's contention, the record supports the court's finding that K.C. was bonded with his siblings and those relationships were important. The court found K.C. and S.B. were a sibling set. The court found they were "very bonded," as they essentially were raised together, having lived with the same caretaker since 2023—almost the entirety of S.B.'s life. They also had been detained together. R.A.B. had not lived with

his brothers, but we can't say the court acted outside the bounds of reason in determining it was in the best interest of the children for all three to stay together.  When visiting with R.A.B., K.C. acted as the big brother he was, nurturing R.A.B. when he cried. K.C. knew S.B. and R.A.B. were his brothers.  Unlike his sibling relationships, K.C.'s relationship with P.T. was new—she didn't meet him until his four-year-old birthday party.  P.T. told the social worker she felt remorseful about the passage of time. She wanted to be a source of support for K.C. and have the opportunity to adopt him.  Not unreasonably, P.T. testified she was interested in providing permanency only for her nephew. But she also testified she wanted to continue overnight visits with him to " 'see how that builds.' "  Remarking on P.T.'s testimony, the court noted, "We are way past exploring how things feel with [P.T.]."  In its section 361.3 report, DCFS wrote that the children had a sibling bond and "deserve[d] to have the opportunity to grow up together, as siblings."  The court agreed, finding it was not in K.C.'s best interest to be separated from his brothers.

Father notes Dr. Ryan seemed surprised that DCFS was planning to keep the children together given S.B.'s aggression toward R.A.B.  S.B.'s biting of R.A.B. is what led to R.A.B.'s removal from mother and separate placement with Ms. S., his former caretaker.  S.B. had been aggressive with K.C. at times, too.  The court specifically noted its concern about the biting incident.  The court also found, however, that the children had "been through an extraordinary amount of things that would cause acting-out behaviors, hyper behaviors, unsettled behaviors."  Indeed, S.B.'s biting occurred after S.B. had been removed from his caregiver of the past year and returned to

mother. The court reasonably could find his aggressive behaviors were a result of the trauma of having been, in the court's words, "bounc[ed] around." As the three children spent more time all together, however, they were acting appropriately with each other.

Father argues the court placed too much emphasis on maintaining the children in the same home and did not apply the statute in a comprehensive manner. He argues P.T. otherwise was "a highly viable placement candidate, . . . and she readily passed muster" under the section 361.3 factors: she was willing and able to provide K.C. permanency, father wished for K.C. to be placed in her care, and she would facilitate visitation between K.C. and his half siblings. Father essentially is asking us to reweigh the factors to put less emphasis on placing the siblings in the same home. We will not do so. (*Alicia B., supra*, 116 Cal.App.4th at p. 864 [job of court reviewing relative placement decision is not to reweigh the evidence].)

Here, the court did not simply conduct "a generalized 'best interest inquiry.' " It independently assessed the relevant factors under section 361.3. (*N.J., supra*, 104 Cal.App.5th at p. 128.) The court may not have discussed every factor on the record, but the court made clear it carefully considered each one, as well as the circumstances specific to this family. The court repeatedly noted the complexity of the placement decision given K.C. had a different father from his brothers and R.A.B. had been placed with a different caretaker. The court considered the evidence and weighed the factors, finding placing the children together in the same home was "a more important consideration here," and "the nature and duration of the relationship" between K.C. and P.T. was "relatively brief." "[O]n balance of the 361.3

37

factors," the court declined to place K.C. with paternal aunt P.T. At the end of the day, the court put K.C.'s best interests first, ordering him suitably placed with his sibling.

The court acted well within its discretion.

### DISPOSITION

We affirm the juvenile court's order and findings.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, Acting P. J.

We concur:



ADAMS, J.



HANASONO, J.